UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| HEATHER STICHT : | |
|    *PLAINTIFF*, : | |
| : | Civil Action No: _____ |
| V. : | |
| : | |
| : | |
| WELLS FARGO BANK, N.A., : | |
|    *DEFENDANT*. : | |
| : | October 14, 2020 |

## COMPLAINT FOR DAMAGES

### Introduction

1. Wells Fargo used defective software to determine eligibility for mortgage modifications, causing Plaintiff, Heather Sticht, to lose her home. Wells Fargo knew about the issue for years but continued to use the defective software while concealing its conduct from plaintiff, the public, and government regulators.

### Jurisdiction and Parties

2. Plaintiff is a citizen of the State of Connecticut.

3. Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota and designated principal place of business in San Francisco, California.

4. The amount in controversy exceeds $75,000 exclusive of costs or interest This Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

**Facts**

A. **Wells Fargo Needlessly Develops Defective Software**

5. During the Great Recession, Congress set aside $50 billion in stimulus funding for the Home Affordable Modification Program (HAMP). The program's purpose was to provide some stability to homeowners and keep people in their homes. Wells Fargo chose to participate in HAMP and accepted $6.4 billion in HAMP funding.

6. As a condition of receiving HAMP funding, Wells Fargo assumed duties to its customers to provide mortgage modifications to all who met the criteria to qualify. Borrowers who qualified for HAMP were generally given a "trial" modification for three months or more. If they were able to pay the modified amount and remained HAMP-eligible they would generally receive a permanent modification.

7. Fannie Mae, a financial-services corporation created by Congress, created a software tool for loan servicers to use for calculating HAMP program eligibility. The software tool was made available free to HAMP-participating loan-servicers like Wells Fargo.

8. Rather than use the government's software, however, Wells Fargo developed its own proprietary software, but Wells Fargo's software was defectively designed and improperly used. It produced hundreds of calculation errors that wrongly denied plaintiff as well as other homeowners mortgage modifications. As a result, Plaintiff along with many other borrowers lost her home.

B. **Wells Fargo's Admissions**

9. In a July 2018 filing with the Securities and Exchange Commission ("SEC"), Wells Fargo revealed that an internal audit of its mortgage modification software found a "calculation error." Wells Fargo said it had corrected the software on October 20, 2015 (though

it did not say it had discovered the error in August 2013). It said the error was due to an "automated miscalculation of attorneys' fees . . . ." It said at least 625 customers were affected and that approximately 400 of those 625 customers lost their homes to foreclosure.

10. In an October 2018 SEC filing, Wells Fargo expanded the number of customers affected, saying the number was 870, of which at least 545 lost their homes. Wells Fargo also disclosed that although it had said the software error had been fixed on October 20, 2015, it had discovered "related errors" that continued until April 30, 2018 until new controls were implemented at the company. At the time, Wells Fargo described its review of the software as "ongoing."

**C.     Wells Fargo's Reckless Lack of Oversight**

11. Plaintiff's loss of her home was no "faulty calculation." It was the result of years of willful and reckless lack of central oversight by corporate leadership at Wells Fargo that has led to repeated regulatory violations and billions of dollars in government fines.

12. Wells Fargo learned as early as August 2013 about deficiencies in its loan modification software. Senior leadership were soon made aware of the problem. In 2014, despite knowing about the problem for more than a year, Wells Fargo decided to continue using the software without fixing the problem. In 2015, despite recognizing that the error "causes a negative customer experience in addition to a reconciling discrepancy," Wells Fargo again chose to do nothing. It told employees expressing concern about the defects that "[n]o fix is going to take place at this time." It was not until April 2018, nearly five years after discovering the error, that Wells Fargo says that "new controls were implemented."

13. Wells Fargo's failures were the result of reckless management decisions and practices. For years, Wells Fargo failed to verify or audit its loan modification software to

ensure the software was properly calculating homeowners' eligibility for government-mandated mortgage modifications. Material errors remained uncorrected in the software for at least five to eight years and potentially longer. Proper auditing and oversight of its processes and procedures would have caught the defective software, improper use of the software, or combination thereof that resulted in hundreds of borrowers losing their homes, but Wells Fargo chose never to correct its auditing and oversight systems during the relevant time period.

14. Wells Fargo's failure to implement proper audits and oversight was endemic for many years despite repeated government warnings and citations.

15. Wells Fargo was cited in 2011 for failing to audit its mortgage modification and foreclosure procedures, and Wells Fargo promised regulators, in consent orders with the Office of the Comptroller of the Currency (OCC), to implement ongoing testing to ensure that it would comply with government requirements in the future.

16. Wells Fargo was on notice in 2011 and continuously thereafter until at least 2018 that audits and validation of its procedures were badly needed,

17. Wells Fargo failed to implement adequate testing and quality control for its mortgage modification and foreclosure procedures and software. As a result, in 2015, OCC found that Wells Fargo was still in continuing noncompliance with the terms of its 2011 consent orders.

18. In 2016, OCC specifically faulted Wells Fargo for failing to catch errors in mortgage modification software, which OCC found had caused Wells Fargo to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014.

19. OCC fined Wells Fargo $70 million for the failures. The failures were directly caused by Wells Fargo's continued failure to implement adequate testing and quality control in

4

its software. Despite the citation for failing to properly oversee mortgage modification and foreclosure operations and software, and being put on notice regarding its inadequate testing and quality control, however, Wells Fargo failed to take any action to prevent such errors from occurring again.

20. Between 2010 and 2018, as a result of its failure to implement adequate testing and quality control procedures, Wells Fargo failed to detect the systematic errors in its software related to mortgage modifications and foreclosures that caused hundreds of homeowners to lose their homes.

21. During that time, Wells Fargo failed to (1) verify its software was working correctly, (2) audit the software for compliance with government requirements, or (3) timely detect, by proper auditing and oversight processes, the faulty calculations that Wells Fargo has admitted caused hundreds of homeowners to lose their homes. When it was made aware of errors, as early as August 2013, it failed to correct the errors or notify borrowers.

22. Wells Fargo says it first learned about the "faulty calculations" at issue in this case in August 2013. But even though Wells Fargo had discovered the error and was required to disclose it to regulatory authorities, it chose not to tell anybody, including OCC. Despite knowing that its mortgage modification software was faulty and had the potential to affect borrowers, Wells Fargo continued to use that defective software when reviewing borrowers' loans for mortgage modifications. Wells Fargo's concealment of the software errors at issue in this case enabled it to avoid a larger penalty from OCC in 2016.

23. Wells Fargo still failed afterward to reform its auditing and validation procedures in mortgage modification and foreclosure, and continued to engage in related errors that caused additional customers to lose their homes, until at least April 2018.

24. Wells Fargo's failure to implement adequate auditing and compliance procedures was the result of an abandonment by the company of its oversight responsibilities, led primarily by the company's "Audit & Examination Committee" and board of directors. The Audit & Examination Committee ignored quarterly reports detailing suspicious sales activities for over a decade, rebuffed an institutional investor's request to address lack of comprehensive audit procedures, and consistently ignored unlawful practices throughout the bank's lending divisions. This intentional abandonment resulted in a number of scandals and a series of government fines, including:

- In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage lending practices discriminated against African American and Hispanic borrowers;
- In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses;
- In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had misrepresented the quality of mortgage loans it sold to Freddie Mac;
- In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for falsely certifying that mortgage loans were eligible for FHA insurance;
- In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations that it engaged in illegal student loan servicing practices;
- In 2016, it was revealed that Wells Fargo encouraged employees to sign up customers for approximately 3.5 million checking and credit cards without their knowledge or consent. Wells Fargo was fined $185 million by federal regulators and over 5,000 employees were fired for their involvement;

- In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing insurance on its auto-loan customers (often leading to wrongful vehicle repossessions) and charging its mortgage-loan customers excessive rate-lock fees;
- In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it engaged in a variety of improper practices, including selling customers renters and life insurance they did not ask for and overcharging for GAP auto insurance.

25. As OCC reported in April 2018, "Since at least 2011, [Wells Fargo] has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," a failure which "caused the Bank to engage in reckless unsafe or unsound practices and violations of law." The violations were such that in February 2018 the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

**D.     Wells Fargo Announces Claimed Remediation**

26. In late 2018, after announcing the error publicly for the first time, Wells Fargo announced a program to "remediate" customers who were affected by its conduct denying mortgage modifications due to the use of faulty software.

27. The program consisted of letters to its customers with the statements "[w]e based our decision on a faulty calculation, and we're sorry. If it had been correct, you would have been approved for a trial modification. We want to make things right." Through the letter, Wells Fargo provided customers with checks, typically for $15,000, and told customers that they could consider mediation through a third-party mediator retained by Wells Fargo if they felt that the check was not sufficient to "make things right."

28.     The mediations were run by Wells Fargo and governed by a set of rules established by Wells Fargo.

## E.     Plaintiff's Experience

29.     Plaintiff was the owner of residential real property at 14 Willow Lane, Clinton, Connecticut, 06413, which she occupied as her primary residence for about 20 years. Wells Fargo was the servicer of a note that Plaintiff executed and of a mortgage on the property that secured the note.

30.     In 2012 and 2013, due to a work injury Plaintiff began to miss work at her job caring for children and adults with intellectual disabilities.  At the same time, her property taxes increased. Before these events, she had never missed or made a late payment, but she began to experience financial difficulties, and she reached out to Wells Fargo to obtain a loan modification to allow her to stay in her home. Wells Fargo agreed to evaluate her for a mortgage modification.

31.     At first, Wells Fargo informed Plaintiff that she was eligible for a temporary modification and modified her loan payment and told her that it would determine whether she was eligible for a permanent modification. Her loan payment was reduced to $25 per month as part of the modification. Plaintiff made timely payments under the temporary modification.

32.     Then Wells Fargo informed Plaintiff that she did not qualify for a mortgage modification and began foreclosure proceedings. Wells Fargo refused to participate in foreclosure mediation in a meaningful way, and in fact it locked Plaintiff out of her home on July 10, 2014, before the Law Day.

33.     As a result of being locked out without notice, Plaintiff was unable to retrieve her personal property from the house. By the time she was allowed back into the house, in

March 2015, much of her personal property was damaged or destroyed because a pipe had burst in the house while it was unoccupied. Plaintiff had to pay out of pocket to repair damage to the house even though she was locked out and unable to live there. Other property Plaintiff had added to the home, including an outdoor pool, was destroyed without an opportunity for her to arrange for safe removal.

34. After locking Plaintiff out of her home, Wells Fargo continued to undertake negotiations with her through foreclosure mediation programs that had the ostensible purpose of returning Plaintiff's home to her. But Wells Fargo forced a sale of the property, via short sale, on January 26, 2016.

35. On or about September 21, 2018, Plaintiff received a letter from Wells Fargo. The letter contains Wells Fargo's admission that Plaintiff should have been approved for a mortgage modification. The letter was accompanied by a $15,000 check that Wells Fargo said was intended to "make things right." At around the same time, an employee of Wells Fargo began making phone calls to her home, about one or two times a week, asking whether Plaintiff had received the letter and whether she would be cashing the check.

36. Plaintiff cashed the check after receiving assurances from Wells Fargo that it would not entail the waiver of any of her legal rights. But the $15,000 given to Plaintiff did not "make things right." Wells Fargo's misconduct, described in this complaint, directly and proximately caused the following damages to Plaintiff:

(a) Wells Fargo took away Plaintiff's opportunity to obtain a permanent loan modification and remain in her home, resulting in economic and non-economic harm.

  (b) Wells Fargo took away Plaintiff's opportunity to realize the property's increase in value since the short sale in 2016. A considerable component of this lost equity was the result of time and money invested by Plaintiff.

  (c) Wells Fargo inflicted extreme emotional distress on Plaintiff, which has caused physical injury and for which she has sought medical treatment, resulting in economic and non-economic harm.

  (d) Wells Fargo damaged Plaintiff's credit, resulting in direct economic harm as well as opportunity costs.

  (e) Plaintiff has lost tax benefits for which she would otherwise be eligible.

  (f) Plaintiff has lost time and money spent in her efforts to avoid foreclosure.

  (g) Plaintiff has spent time and money finding temporary housing, moving to new housing, and paying for new housing.

### Tolling Allegations

37. Plaintiff had no ability to know that her mortgage modification requests were rejected due to an internal fault in Wells Fargo's private mortgage loan modification software until it was disclosed to her in September 2018. No amount of due diligence by Plaintiff could have uncovered the facts alleged in this Complaint prior to at least August 3, 2018, when Wells Fargo made its initial disclosure to the SEC. Thus, any statutes of limitations applicable to Plaintiff's claims have been tolled by operation of the discovery rule by her inability to have a reasonable opportunity to discover the unlawful injury giving rise to this complaint.

38. Any applicable statute of limitations has also been tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts alleged in this complaint. Wells Fargo discovered one of the software errors in October 2015 but deliberately concealed its discovery

from Plaintiff until the second half of 2018. Wells Fargo was under a continuous duty to disclose the truth, knew that it was concealing essential facts for Plaintiff's cause of action, and Plaintiff reasonably relied on Wells Fargo's ongoing concealment.

39. Wells Fargo's continued concealment compounded the harms to Plaintiff. Wells Fargo's concealment estops it from relying on any statutes of limitations defense in this action.

## First Claim
## Unfair Trade Practices

40. At all relevant times, Wells Fargo was engaged in trade or commerce within the meaning of the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a et. seq. (CUTPA).

41. Wells Fargo engaged in unfair and deceptive practices within the scope of CUTPA by improperly rejecting Plaintiff's mortgage modification application although she qualified for and should have received a modification.

42. Wells Fargo further engaged in unfair and deceptive practices by using defective software improperly designed or improperly used in order to reject Plaintiff's mortgage modification application although she qualified for and should have received a modification.

43. Wells Fargo further engaged in unfair and deceptive practices by, for expedience, recklessly failing to implement proper auditing and oversight of its mortgage modification and foreclosure processes and procedures.

44. Wells Fargo further engaged in unfair and deceptive practices by withholding the knowledge of its error that triggered improper rejection of the mortgage modification applications for nearly three years after learning of the error.

45. Wells Fargo further engaged in unfair and deceptive practices by violating HAMP and other governmental requirements regarding mortgage modifications, despite

11

choosing to participate in HAMP and to abide by the requirements of programs in which it was participating.

46. Wells Fargo further engaged in unfair and deceptive practices by failing to properly oversee bank compliance with HAMP and other governmental requirements.

47. Wells Fargo' unfair and deceptive practices, described above, are unethical, unscrupulous, and substantially injurious to consumers; had no legitimate utility or benefit to consumers; and run afoul of the public policy of the State of Connecticut and the United States.

48. As a result of Wells Fargo's violations of CUTPA, Plaintiff has suffered ascertainable losses within the meaning of the statute as well as injury-in-fact, including loss of her home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following foreclosure; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into her home; loss of time and money to find new housing and move her family; damage to credit; physical injuries; and emotional distress.

49. Plaintiff is also entitled to punitive damages because Wells Fargo's conduct which violated CUTPA, as described in this complaint, reveals a reckless indifference to Plaintiff's rights as a consumer of housing.

### Second Claim
### Unjust Enrichment

50. The conduct described in this complaint unjustly deprived Plaintiff of the benefits of mortgage modification that she was entitled to because she qualified to receive mortgage modification relief.

51. Wells Fargo denied Plaintiff the relief she was entitled to receive, and it was in turn unjustly enriched by penalties, fees, and other charges resulting from the financial implications of the denial of a mortgage modification.

52. Allowing Wells Fargo to retain the fees and other benefits it received from the foreclosure, the short sale, and/or the denial of the modification is unjust because they were obtained as the result of unlawful, unfair, or fraudulent practices. Wells Fargo should be held accountable for its misconduct, including the subsequent refusal to timely reveal the issue.

53. Allowing Wells Fargo to retain the benefits of its wrongful conduct defeats society's reasonable expectations of mortgage loan contracts and the federal government's purpose in enacting mortgage modification relief programs such as HAMP.

54. Plaintiff is entitled in equity to restitution and disgorgement to the extent that this remedy is unavailable to them under the written security instruments.

### Third Claim
### Negligence

55. Wells Fargo undertook to review Plaintiff's mortgage loans for potential modification. In doing so, Wells Fargo assumed a duty to Plaintiff to exercise reasonable care when determining whether Plaintiff was eligible for a mortgage modification.

56. Wells Fargo breached its duty by evaluating Plaintiff's eligibility using automated software that had not been properly verified or audited to ensure accuracy. Wells Fargo permitted multiple systematic errors in its software to remain uncorrected for five to eight years. It failed to properly verify or audit its software even after several government citations and notices that it was required to reform its mortgage modification and foreclosure processes, and even after it discovered the software errors at issue in this case.

57. Wells Fargo's negligence is also established under the doctrine of negligence per se, as its conduct violated HAMP; its violations of HAMP caused Plaintiff to be wrongfully denied a mortgage modification and to suffer damages.HAMP was designed to maximize

assistance to homeowners and prevent foreclosures; and Plaintiff was among the homeowners for whose protection HAMP was adopted.

58. Wells Fargo's negligence also arises from its knowledge of its conduct, the potential effect of that conduct on customers, and its failure to take action to remedy the potential effects. Although Wells Fargo has indicated that it initially discovered the faulty software in 2015, the error was in fact found much earlier, in 2013. After the error was discovered, senior leadership was made aware of it and how to correct it. However, nothing was done to correct the error or notify borrowers about it until late 2018.

59. Plaintiff's injuries were readily foreseeable given Wells Fargo's knowledge about the faulty software.

60. Connecticut public policy favors finding that Wells Fargo had a duty to Plaintiff because if Wells Fargo is not held accountable for knowingly denying government-mandated modifications, while accepting stimulus money for participating in government mortgage assistance programs, banks will not have an incentive to abide by government regulations that protect homeowners and Wells Fargo will not have had an incentive to do what it failed to do here: properly audit its mortgage modification software, promptly disclose errors within that software, or notify borrowers of errors.

61. Wells Fargo is also liable under the doctrine of negligent misrepresentation. Wells Fargo provided reasons for the denial of Plaintiff's mortgage modifications that were false and that it had reason to know were false. Wells Fargo breached its duty not to make a material misrepresentation about the status of a loan modification by continuing to offer mortgage modifications using a software tool it knew provided false information, and failing to

advise Plaintiff that the decision to deny her mortgage modification was determined by faulty software.

62. Plaintiff was not told that her mortgage modification was being denied due to inaccurate calculations being made by faulty software. Plaintiff justifiably relied on the information that the denial was not based on Wells Fargo's error because the truth was being actively concealed by Wells Fargo, and Plaintiff had no reason to suspect the information provided to her was untrue.

63. Wells Fargo's negligence caused Plaintiff damages as described above in this complaint.

## Fourth Claim
## Recklessness

64. The injuries to Plaintiff were caused by the Wells Fargo's recklessness in that Wells Fargo's conduct, described above, was the product of wanton misconduct and reckless indifference to its customers' rights and well-being.

65. Plaintiff seeks punitive damages against Wells Fargo for its conduct, which evidences a willful, wanton, and reckless disregard of her rights.

## Fifth Claim
## Negligent Infliction of Emotional Distress

66. Wells Fargo knew or should have known that its conduct involved an unreasonable risk of causing emotional distress and that such distress, if it were caused, might result in illness or bodily injury.

67. Wells Fargo's negligent and reckless conduct caused Plaintiff emotional distress.

68. The distress Plaintiff suffered was of such a nature that it has resulted and may in the future result in illness or bodily harm.

69. The distress suffered by Plaintiff was foreseeable and reasonable in light of Wells Fargo's conduct.

70. Plaintiff is entitled to compensatory damages as a result of Wells Fargo's negligent conduct that resulted in emotional distress.

## Sixth Claim
## Intentional Infliction of Emotional Distress

71. Wells Fargo's conduct, described in this complaint, was extreme and outrageous. Its errors affected thousands of lives and it concealed the errors for years. It did so with the purpose of evading government oversight. This conduct was responsible for Plaintiff losing her home. In light of its agreements with regulators and continuing violations of those agreements, Wells Fargo's conduct amounted to reckless, wanton, and willful conduct.

72. As a result of Wells Fargo's conduct, Plaintiff has suffered severe emotional distress, which has contributed to physical and psychological injuries.

73. Plaintiff seeks compensatory as well as punitive damages against Wells Fargo for its intentional infliction of emotional distress.

## Seventh Claim
## Breach of Implied Covenant of Good Faith and Fair Dealing

74. Mortgage modification programs were specifically created to assist qualified borrowers experiencing financial hardship. Plaintiff entered into negotiations for modifications with Wells Fargo with the expectation of good faith and fair dealing by Wells Fargo. Wells Fargo, however, failed to act in a manner consistent with its borrower's objectively reasonable expectations. Wells Fargo dragged out the process for an extended period of time, and then denied the application for mortgage modification despite Plaintiff actually qualifying for the relief.

75. Wells Fargo compounded the problem by making no effort for almost three years to notify Plaintiff that her mortgage modification may have been improperly denied, leaving Plaintiff to suffer with the continuing financial effects of foreclosure.

76. Wells Fargo's conduct breached the implied covenant of good faith and fair dealing inherent in all commercial relationships in the State of Connecticut, entitling Plaintiff to damages for her injuries.

### Eighth Claim
### Breach of Contract

77. When Plaintiff financed her home, she entered into Security Instruments (typically referred to as a mortgage, deed of trust, or security deed) that set forth the conditions under which the lender could accelerate the borrower's payments and foreclose on the property.

78. Plaintiff's' mortgage loans were insured, guaranteed, or held by a federal government agency and her Security Instruments were form Federal Housing Administration (FHA) and/or Fannie Mae/Freddie Mac Security Instruments. Wells Fargo breached both types of Security Instruments.

79. Wells Fargo was subject to the terms of these security instruments, as either the original lender, an assignee, or as the mortgage servicer authorized to act on behalf of the lender.

80. Under the Security Instruments, Wells Fargo was required to give notice to Plaintiff before it was permitted to accelerate the remaining balance on her loan and initiate the foreclosure process. That notice was required to specify the borrower's default, the action required by the borrower to cure the default, and the date by which the borrower must cure the default to avoid acceleration and foreclosure proceedings. The Security Instruments

contemplated the possibility of forbearance or modification of the sums secured by the Security Instruments. Wells Fargo agreed it was limited by regulations issued under federal law.

81. Wells Fargo breached its contractual obligations to Plaintiff by failing to give her adequate notice prior to accelerating her loan payments, commencing the foreclosure process, and forcing a short sale.

82. In particular, Wells Fargo did not notify Plaintiff that she could cure her default and avoid acceleration and foreclosure by accepting a mortgage modification. The Security Instruments allowed borrowers to avoid foreclosure and cure defaults through mortgage modification. Plaintiff qualified for a government-mandated mortgage modification, and Wells Fargo was required to offer her a mortgage modification but failed to do so. While the government-mandated mortgage modifications became available after Plaintiff signed her Security Instruments, they required Wells Fargo to inform her of actions available to cure her default at the time of the default – not just at the time the parties executed the contract. Because mortgage modification was an option that should have been available to Plaintiff, but Wells Fargo failed even to notify her about that option, Wells Fargo breached the Security Instruments.

83. As a result of Wells Fargo's breach, Plaintiff suffered damages.

**Prayer for Relief**

WHEREFORE, Plaintiff requests the following relief:

    A.    Compensatory Damages;

    B.    Statutory damages;

    C.    Punitive damages;

    D.    Attorneys' fees and costs;

    E.    Such other and further relief as allowed by applicable law or the Court may deem proper.

PLAINTIFF

By /s/ David N. Rosen
David N. Rosen ct00196
Barbara Goren ct26728
David Rosen & Associates, P.C.
400 Orange Street
New Haven, CT 06511
(203) 787-3513
(203) 787-1605 fax
drosen@davidrosenlaw.com
bgoren@davidrosenlaw.com

## **CLAIM FOR JURY TRIAL**

Plaintiff claims trial by jury.