## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HEATHER STICHT              :
    *PLAINTIFF*,          :
                        :   Civil Action No: 3:20-cv-01550 (VAB)
V.                          :
                        :
                        :
WELLS FARGO BANK, N.A.,      :
    *DEFENDANT*.          :   February 17, 2021

## FIRST AMENDED COMPLAINT FOR DAMAGES

### Introduction

1.   Plaintiff lost her home because Wells Fargo wrongly determined that she, along with hundreds of other homeowners, did not qualify for a mortgage modification. This wrongful determination was the result of years of a willful and reckless lack of central oversight, described below, by Wells Fargo's Board and executive leadership, that has led to repeated compliance breakdowns and billions of dollars in government fines. Plaintiff brings this diversity damages action to recover for the injuries and losses caused by Wells Fargo's conduct.

### Jurisdiction and Parties

2.   Plaintiff is a citizen of the State of Connecticut.

3.   Defendant Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota and designated principal place of business in San Francisco, California.

4.   The amount in controversy exceeds $75,000 exclusive of costs or interest This Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## **Facts**

5.   For years, Wells Fargo failed to verify or audit its loan modification software to ensure that it was properly calculating homeowners' eligibility for government-mandated mortgage modifications. Material errors remained uncorrected in the software for five to eight years, if not longer.

6.   The federal government cited Wells Fargo in 2011 for failing to adequately audit its mortgage modification and foreclosure procedures, and Wells Fargo's Board and executive leadership promised to implement ongoing testing to ensure that the Bank complied with government requirements in the future. But they failed to live up to that promise and multiple errors in Wells Fargo's decision-making software remained unaddressed.

7.   Wells Fargo's leadership failed to implement adequate testing even after the government found that another error in the Bank's software had led the Bank to wrongfully deny mortgage modifications in 2013-2014. Wells Fargo was cited again for failing to properly oversee the Bank's mortgage modification and foreclosure operations but still did nothing to stop others like Plaintiff from being wrongfully denied mortgage modifications and foreclosed upon.

8.   Not until August 2013 did Wells Fargo discover one of the errors that led it to wrongfully deny mortgage modifications to Plaintiff and hundreds of other homeowners. But Wells Fargo kept its discovery secret—likely in an effort to avoid additional government penalties. The government had previously imposed restrictions on Wells Fargo's mortgage servicing business and announced fines, with the amount of the fine and the duration of business restrictions dependent on the length and severity of the Bank's continued non-compliance. Had Wells Fargo disclosed another scandal that led it to unlawfully deny mortgage modifications to hundreds of customers, the government likely would not have lifted its business restrictions in 2016 and would have imposed a far more severe penalty than the $70 million fine it ultimately issued.

9.   Moreover, despite knowing in 2013 that its mortgage modification software was faulty and had the potential to injure borrowers, Wells Fargo continued to use that faulty software when reviewing borrowers' loans for mortgage modifications. As a result, Wells Fargo wrongfully denied mortgage modifications to Plaintiff and other homeowners, and in many cases foreclosed on their homes.

10. The Wells Fargo Board's repeated failure to fulfill its oversight responsibilities, despite promising to do so as part of multiple consent decrees, grew so flagrant—and led to so many scandals and consumer abuses—that in 2018 the Federal Reserve placed an asset-cap on Wells Fargo that will not be lifted until Wells Fargo convinces the government it has finally reformed its central oversight practices. The Federal Reserve's cease-and-desist order has been described as a "Fear of God Penalty," with one expert opining that the Bank is "lucky it is too big to shut down."

11. After the Federal Reserve issued the asset-cap in February 2018, Wells Fargo announced an overhaul of its Board. Wells Fargo has since disclosed to its shareholders what it learned in 2015— that hundreds of its customers were wrongfully and unlawfully denied mortgage modifications, with many of those customers subsequently losing their homes. Following that initial disclosure, Wells Fargo discovered yet another error in its automated decision-making tool, which caused even more homeowners to be wrongfully denied mortgage modifications.

**Wells Fargo Wrongfully Foreclosed on Its Customers' Homes**

12. Plaintiff is among the millions of homeowners who had trouble making ends meet during the Great Recession. Like them, she fell behind on their mortgage payments and needed help to avoid losing her home.

13. The Home Affordable Modification Program (HAMP) was designed to provide the very help that Plaintiff and other homeowners needed. Introduced pursuant to the Emergency Economic Stabilization Act of 2008, HAMP required mortgage servicers to offer loan modifications to

borrowers who met certain threshold requirements. These modifications would lower a borrower's mortgage payments to a manageable level (typically 31 percent of the borrower's monthly income) and allow the borrower to avoid foreclosure.

14. Similar threshold requirements were incorporated into the mortgage modification requirements of government-sponsored enterprises (or GSEs), such as Fannie Mae and Freddie Mac, and the Federal Housing Administration (FHA).

15. Many homeowners, including Plaintiff, met the threshold requirements for a mortgage modification and as their mortgage servicer Wells Fargo was required to offer them a loan modification. Wells Fargo failed to do so, however, and instead foreclosed hundreds of homeowners who could not make their monthly payments without a modification.

16. Hundreds more borrowers were just able to stave off foreclosure, but not without overcoming numerous financial and emotional difficulties that could have been avoided if Wells Fargo had lowered their mortgage payments as HAMP and other GSEs required.

### Wells Fargo Failed to Adequately Test Its Automated Decision-Making Tool Over a Period of at Least 8 Years

17. Wells Fargo acknowledged only late in 2018 that it wrongfully denied Plaintiff and other homeowners mortgage loan modifications to which they were entitled under HAMP and other government requirements.

18.  In form letters sent to Plaintiff and other homeowners in late 2018, Wells Fargo claimed that its decision was based on a "faulty calculation." The problem goes much deeper than a single miscalculation, however, and reflects the same type of extreme and outrageous conduct that has embroiled Wells Fargo in a string of public scandals.

19. Between 2010 and 2018, Wells Fargo failed to detect multiple systematic errors in its automated decision-making tool. This software determined customers' eligibility for a government-mandated mortgage modification during a time of extreme financial distress. Yet Wells Fargo not

only failed to verify that its software was correctly calculating whether customers met threshold requirements for a mortgage modification, it failed to regularly and properly audit the software for compliance with government requirements—allowing life-changing errors to remain uncorrected for years on end.

20. Wells Fargo was not required to develop its own tool to calculate whether its customers were eligible for government-mandated mortgage modifications. The government provided a free software tool for mortgage servicers to use in determining whether homeowners met threshold requirements. If Wells Fargo was not going to properly verify and audit its own software, it could have—and should have—used the free software instead.

21. As a result of Wells Fargo's deficient auditing and compliance procedures, the Bank repeatedly violated HAMP and other government requirements over a period of at least eight years and denied Plaintiff and other homeowners mortgage modifications that the Bank was legally required to offer.

### Wells Fargo's Leadership Failed to Implement Adequate Testing Even After Promising to Do So as Part of 2011 Consent Decrees

22. Wells Fargo failed to use appropriate auditing and compliance procedures even after a 2010 investigation by the Office of Comptroller of the Currency (OCC) found numerous deficiencies in the Bank's mortgage modification and foreclosure practices.

23. The OCC found, among other things, that the Bank had failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures.

24. Wells Fargo agreed to correct these deficiencies in two 2011 consent orders, one of which was signed by the Bank's Board of Directors (all of whom were also officers and/or directors of Wells Fargo & Company), and the other of which was signed by WFC pursuant to a resolution passed by WFC's Board of Directors.

25. Wells Fargo pledged in the 2011 consent orders to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the Bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied. The Bank also promised to maintain a Compliance Committee of board members to monitor its ongoing compliance with the Consent Order.

26. In one of the consent orders, the Federal Reserve specifically ordered WFC's Board of Directors to take steps to ensure the Bank complied with its obligations under the consent orders, including by strengthening the Board's oversight of compliance with HAMP and other government requirements; to ensure that audit and compliance programs were adequately staffed; and to improve the information and reports that would be regularly reviewed by WFC's Board of Directors.

27. Wells Fargo subsequently reported to the Federal Reserve that the Bank's Compliance Committee was meeting as required, that the Audit & Examination Committee of WFC's Board of Directors would also assume ongoing responsibility for oversight and compliance based on improved reporting, and that WFC's Chief Operational Risk Officer was providing both the Compliance Committee and the Audit & Examination Committee with the necessary information and testing results for them to effectively oversee the Bank's mortgage modification and foreclosure practices and ensure compliance with HAMP and other government requirements.

28. Together, Wells Fargo's executives and board members—in particular, Wells Fargo's Compliance Committee, Chief Operational Risk Officer, and Audit & Examination Committee— were supposed to make sure that the Bank conducted the necessary testing to detect and remedy any violations of HAMP and other government requirements. They repeatedly failed to fulfill these obligations over the course of several years, however—in violation of the promises they made in the 2011 Consent Order and in disregard of the well-being of their customers.

29. In June 2015, four years after Wells Fargo agreed to the terms of the 2011 consent orders, the OCC found that the Bank was still in continuing noncompliance. Among other things, the OCC found that Wells Fargo had not maintained ongoing testing for compliance with HAMP and other government requirements; had not ensured that the Bank's audit and compliance programs had the requisite authority and status within Wells Fargo so that deficiencies in the Bank's mortgage modification and foreclosure practices would be identified and promptly remedied; and had not ensured that the Bank was making reasonable good faith efforts, consistent with HAMP and other government requirements, to modify delinquent mortgage loans and prevent foreclosures of its customers' homes.

### Wells Fargo Concealed Its Discovery of One of the Systematic Errors from Regulators and Consumers

30. In response to Wells Fargo's ongoing violations of the 2011 Consent Order, the OCC prohibited the Bank from growing its residential mortgage servicing business until Wells Fargo brought its operations into compliance with an amended consent order. The OCC also stated that it would be taking additional action against Wells Fargo, the nature and severity of which would depend on the nature, length, and severity of the Bank's continued noncompliance with the amended consent order.

31. As a result of Wells Fargo's continuing failure to implement adequate auditing and compliance procedures, Wells Fargo apparently failed to notice an error in its mortgage modification software that led the Bank to wrongly deny mortgage modifications to 184 customers between March 2013 and October 2014. The OCC specifically noted this error in its May 24, 2016 order requiring Wells Fargo to pay a civil money penalty of $70 million.

32. Unbeknownst to the OCC, Wells Fargo had discovered another error in its mortgage modification software in August 2013—one of the errors at issue in this case—which caused the Bank to wrongly deny mortgage modifications to 625 customers. Well Fargo decided not to tell

anybody it had discovered this error—likely as part of an effort to avoid a larger penalty from the OCC and ensure that the OCC would terminate its supervision of the Bank under the 2011 Consent Order and lift the business restrictions it had imposed in 2015.

33. The Bank's seven-member Board of Directors, each of whom also served on WFC's Board of Directors, signed the stipulation under which the Bank accepted the $70 million penalty and acknowledged the error that led the Bank to wrongly deny mortgage modifications to 184 customers in 2013-2014. These directors did not disclose that the Bank had discovered another error—either because their oversight was so non-existent that they did not know, or because they chose to deliberately mislead the OCC to minimize the Bank's penalty and ensure that the OCC lifted the business restrictions it had imposed on the Bank.

34. To make matters worse, even after discovering the 2013 error, Wells Fargo still did not reform its auditing and verification practices. Related errors that would affect an additional 145 customers were not discovered until five years later.

### Wells Fargo's Repeated Failure to Test Its Automated Tool Stemmed from the Company's Chronic and Intentional Lack of Central Oversight

35. The failure of Wells Fargo's executives and board members to implement adequate auditing and compliance procedures was not an accident. As scandal after scandal comes to light, it has become clear that Wells Fargo's leaders intentionally abandoned their oversight responsibilities.

36. The most notorious example is the fraudulent account scandal uncovered in 2016, when it was revealed that Wells Fargo employees were encouraged to sign up customers for some 3.5 million checking and credit card accounts without their knowledge. Wells Fargo was fined $185 million by federal regulators and over 5,000 employees (roughly 1% of Wells Fargo's workforce) were fired for their involvement in the scandal.

37. The fraudulent account scandal also involved the Audit & Examination Committee, which

ignored quarterly reports detailing suspicious sales activities for over a decade and rebuffed an institutional investor's request that the Board address its lack of comprehensive audit procedures and adjust compensation policies to discourage abusive sales practices. The two executives most associated with the fraudulent account scandal—John G. Stumpf and Carrie L. Tolstedt—were signatories to one of the 2011 consent orders discussed above and among those responsible for Wells Fargo's failure to comply with the orders by implementing adequate auditing and compliance procedures.

38. Cases arising out of the fraudulent account scandal are far from the only examples of Wells Fargo's Board and executive leadership abdicating their oversight responsibilities. Wells Fargo's Board and executive leadership have consistently ignored unlawful practices throughout the Bank's lending divisions, leading to an unprecedented series of government fines. To give more examples: 1) In July 2012, Wells Fargo agreed to pay $175 million to settle charges that its mortgage lending practices discriminated against African-American and Hispanic borrowers; 2) In January 2013, Wells Fargo was one of ten major lenders that agreed to pay a total of $8.5 billion to resolve claims of foreclosure abuses; 3) In September 2013, Wells Fargo agreed to pay $869 million to resolve claims it had misrepresented the quality of mortgage loans it sold to Freddie Mac; 4) In April 2016, Wells Fargo agreed to pay $1.2 billion and accepted responsibility for falsely certifying that mortgage loans were eligible for FHA insurance; 5) In August 2016, Wells Fargo agreed to pay a $3.6 million penalty to resolve allegations that it engaged in illegal student loan servicing practices; 6) In April 2018, Wells Fargo was fined a total of $1 billion for improperly force-placing insurance on its auto-loan customers (often leading to wrongful vehicle repossessions) and charging its mortgage-loan customers excessive rate-lock fees; 7) In December 2018, Wells Fargo agreed to pay $575 million to resolve allegations it engaged in a variety of improper practices,

including selling customers renters' and life insurance they did not ask for and overcharging for GAP auto insurance.

39. Just as it did in the 2011 Consent Order, Wells Fargo often promised to reform its central oversight as part of its settlements with the government. Each time, Wells Fargo's Board and executives failed to live up to those promises and continued to abdicate their oversight responsibilities. As the OCC stated in April 2018, "Since at least 2011, the Bank has failed to implement and maintain a compliance risk management program commensurate with the Bank's size, complexity and risk profile," which "caused the Bank to engage in reckless unsafe or unsound practices and violations of law."

40. Wells Fargo's persistent failure to implement adequate auditing and compliance procedures has grown so flagrant and resulted in so many consumer abuses that, in February 2018, the Federal Reserve Board announced that it would prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls.

41. In its Cease and Desist Order to Wells Fargo, the Federal Reserve Board found that Wells Fargo had pursued a business strategy that emphasized sales and growth without ensuring that senior management had maintained an adequate risk management framework, which resulted in weak compliance practices.

42. Wells Fargo was ordered to submit a plan for reforming Board oversight and governance, including steps that it will take to hold senior management accountable, maintain a management structure that promotes effective oversight and compliance control, and ensure the comprehensive reporting necessary for the Board to oversee the firm's execution of its compliance control program.

43. Wells Fargo was also ordered to submit a plan for reforming its firm-wide compliance program, which must include effective testing and validation measures for compliance with applicable laws.

44. Until Wells Fargo's plans for reform are approved by the Federal Reserve and the implementation of those reforms pass independent review by a third-party auditor, Wells Fargo is subject to an asset cap that restricts the company from growing larger.

45. As one banking expert told the New York Times, Wells Fargo "is lucky it is too big to shut down." "A smaller bank might have lost its banking licenses."

### Wells Fargo's Disclosure of the 2013 Error and Discovery of More Errors

46. A few months after the Federal Reserve's 2018 Cease and Desist Order, and facing the prospect of review by a third-party auditor, Wells Fargo finally disclosed the 2013 error—first to its shareholders in its Q2 2018 Form 10-Q and then to the customers who were denied mortgage modifications, many of whom lost their homes as a result of the error. Wells Fargo wrote in its 10-Q that approximately 625 customers were incorrectly denied a loan modification between April 12, 2010, and October 20, 2015, when the error was corrected.

47. Three months later, in its next Form 10-Q, Wells Fargo disclosed that it had discovered related errors that affected approximately 245 more customers who were incorrectly denied a mortgage modification between March 15, 2010, and April 30, 2018, when, Wells Fargo says, "new controls were implemented." These related errors raised the number of affected customers to approximately 870.

### Plaintiff's Experience

48. Plaintiff was the owner of residential real property at 14 Willow Lane, Clinton, Connecticut, 06413, which she occupied as her primary residence for about 20 years. Wells Fargo was the servicer of a note that Plaintiff executed and of a mortgage on the property that secured the note.

49. In 2012 and 2013, due to a work injury Plaintiff began to miss work at her job caring for

children and adults with intellectual disabilities.  At the same time, her property taxes increased. Before these events, she had never missed or made a late payment, but she began to experience financial difficulties, and she reached out to Wells Fargo to obtain a loan modification to allow her to stay in her home. Wells Fargo agreed to evaluate her for a mortgage modification.

50. At first, Wells Fargo informed Plaintiff that she was eligible for a temporary modification and modified her loan payment and told her that it would determine whether she was eligible for a permanent modification. Her loan payment was reduced to $25 per month as part of the modification. Plaintiff made timely payments under the temporary modification.

51. Then Wells Fargo informed Plaintiff that she did not qualify for a mortgage modification and began foreclosure proceedings. Wells Fargo refused to participate in foreclosure mediation in a meaningful way and forced a sale of Plaintiff's home, via short sale, on January 26, 2016.

52. Plaintiff was forced to move with her daughter to a rental apartment where instead of making modified mortgage payments she paid rent. She had returned to work and was capable of making modified mortgage payments

53. On or about September 21, 2018, Plaintiff received a letter from Wells Fargo. The letter contains Wells Fargo's admission that Plaintiff should have been approved for a mortgage modification. The letter was accompanied by a $15,000 check that Wells Fargo said was intended to "make things right." The letter also acknowledged that it would not make Plaintiff financially whole but would only "help make up for your financial loss."  At around the same time, an employee of Wells Fargo began making phone calls to her home, about one or two times a week, asking whether Plaintiff had received the letter and whether she would be cashing the check.

54. Plaintiff cashed the check after receiving assurances from Wells Fargo that doing so would not entail the waiver of any of her legal rights. But the $15,000 given to Plaintiff did not "make things right." Wells Fargo's misconduct described in this complaint directly and proximately caused the following damages to Plaintiff:

(a)     Wells Fargo took away Plaintiff's opportunity to obtain a permanent loan modification and remain in her home – an opportunity she could and would have taken advantage of -  resulting in economic and non-economic harm.

(b)     Wells Fargo took away the difference in the property's value between the short sale price and its current - and appreciating – value, which now very substantially exceeds the amount of the mortgage.

(c)     Wells Fargo inflicted extreme emotional distress on Plaintiff, which has caused physical injury and for which she has sought medical treatment, resulting in economic and non-economic harm.

(d)     Wells Fargo damaged Plaintiff's credit, resulting in direct economic harm as well as opportunity costs.

(e)     Plaintiff has lost tax benefits for which she would otherwise be eligible.

(f)     Plaintiff has lost time and money spent in her efforts to avoid foreclosure.

(g)     Plaintiff has spent time and money finding temporary housing, moving to new housing, and paying for new housing.

(h) Plaintiff's personal property was damaged or destroyed in the course of the wrongful foreclosure, to her loss.

**Tolling Allegations**

55. Plaintiff was part of a putative class of homeowners in the case of *Hernandez, et al v.*

13

*Wells Fargo Bank, N.A.*, 3:18cv07354(WHA), in the Northern District of California. Homeowners, including Plaintiff, whose homes were lost in short sales were not excluded from the class until 2020.  Further, Plaintiff had no ability to know that her mortgage modification requests were rejected due to an internal fault in Wells Fargo's private mortgage loan modification software until it was disclosed to her in September 2018. No amount of due diligence by Plaintiff could have uncovered the facts alleged in this Complaint prior to at least August 3, 2018, when Wells Fargo made its initial disclosure to the SEC. Thus, any statutes of limitations applicable to Plaintiff's claims have been tolled by the pendency of the class action and by the discovery rule on account of her inability to have a reasonable opportunity to discover the unlawful injury giving rise to this complaint.

56. Any applicable statute of limitations has also been tolled by Wells Fargo's knowing, active, and ongoing concealment of the facts alleged in this complaint. Wells Fargo discovered one of the software errors in October 2015 but deliberately concealed its discovery from Plaintiff until the second half of 2018. Wells Fargo was under a continuous duty to disclose the truth and knew that it was concealing essential facts for Plaintiff's cause of action, and Plaintiff reasonably relied on Wells Fargo's ongoing concealment.

57. Wells Fargo's continued concealment compounded the harms to Plaintiff. Wells Fargo's concealment estops it from relying on any statutes of limitations defense in this action.

**First Claim**
**Unfair Trade Practices**

58. At all relevant times, Wells Fargo was engaged in trade or commerce within the meaning of the Connecticut Unfair Trade Practices Act, C.G.S. § 42-110a et. seq. (CUTPA).

59. Wells Fargo's conduct concerning a mortgage modification for Plaintiff was part of the

extensive course of conduct that included the unfair and deceptive practices described in paragraphs 5-47 and 49-51 above.  Some of that conduct included the conduct described in the following paragraphs 60-65.

60. Wells Fargo's practice of using systematically-flawed software to calculate Plaintiff's eligibility for mortgage loan modifications was unfair and deceptive, as it led her to believe that she did not qualify for a mortgage modification and caused her to be wrongly denied a mortgage modification.

61. The automated software's calculations had not been properly verified or audited, and as a result, multiple material errors remained uncorrected in the software for five to eight years. Wells Fargo willfully and recklessly continued to rely on its software even after the government cited it for failing to adequately audit its mortgage modification and foreclosure procedures; even after the government found a software error had led the Bank to wrongfully deny mortgage modifications in 2013-2014; and even after Wells Fargo discovered another software error that caused it to wrongly deny modifications in 2015.

62. As described above, Wells Fargo further engaged in unfair and deceptive practices by, for expedience, recklessly failing to implement proper auditing and oversight of its mortgage modification and foreclosure processes and procedures.

63. Wells Fargo further engaged in unfair and deceptive practices by withholding the knowledge of its error that triggered improper rejection of the mortgage modification applications for nearly three years after learning of the error.

64. Wells Fargo further engaged in unfair and deceptive practices by violating HAMP and

other governmental requirements regarding mortgage modifications despite choosing to participate in HAMP and to abide by the requirements of programs in which it was participating.

65. Wells Fargo further engaged in unfair and deceptive practices by failing to properly oversee bank compliance with HAMP and other governmental requirements.

66. Wells Fargo' unfair and deceptive practices, described above, are unethical, unscrupulous, and substantially injurious to consumers; had no legitimate utility or benefit to consumers; and violate the public policy of the State of Connecticut.

67. Plaintiff justifiably relied on Wells Fargo's determination that she did not qualify for a mortgage modification. Had Wells Fargo presented accurate information to her, she would have opted for the mortgage modification for which she qualified and whose terms she would have been able to comply with. If Wells Fargo for some reason still refused to provide Plaintiff with a mortgage modification, she could and would have used the knowledge that she qualified for a mortgage modification to fight foreclosure.

68. As a result of Wells Fargo's violations of CUTPA, Plaintiff has suffered ascertainable losses within the meaning of the statute as well as injury-in-fact, including loss of her home; loss of equity in her home; loss of tax benefits; loss of appreciation in her home's value following foreclosure and short sale; loss of time and money spent in an effort to avoid foreclosure; loss of time and money put into her home; loss of time and money to find new housing and move her family; damage to her credit; and severe emotional distress.

69. Plaintiff is also entitled to punitive damages because Wells Fargo's conduct which violated CUTPA, as detailed in this complaint, reveals a reckless indifference to Plaintiff's rights as a consumer of housing.

**Second Claim**
**Unjust Enrichment**

70. The conduct described above unjustly deprived  Plaintiff of the benefits of mortgage modification that she was entitled to because she qualified to receive mortgage modification relief provided by federal law – specifically, the HAMP program.

71. Wells Fargo denied Plaintiff the relief she was entitled to receive and would have received had Wells Fargo not concealed its errors, and it was in turn unjustly enriched by penalties, fees, and other charges resulting from the financial implications of the denial of a mortgage modification. Wells Fargo was also enriched by obtaining immediate payment of the proceeds of the short sale rather than awaiting payment and receiving it over the course of many years and subject to the terms of HAMP.

72. Allowing Wells Fargo to retain the fees and other benefits it received from the foreclosure, the short sale, and/or the denial of the modification is unjust because they were obtained as the result of unlawful, unfair, or fraudulent practices. Wells Fargo should be held accountable for its misconduct, including the subsequent refusal to timely reveal the issue.

73. Allowing Wells Fargo to retain the benefits of its wrongful conduct defeats society's reasonable expectations of mortgage loan contracts and the federal government's purpose in enacting mortgage modification relief programs such as HAMP.

74. Plaintiff is entitled in equity to restitution and disgorgement to the extent that this remedy is unavailable to her under the written security instruments.

**Third Claim**
**Recklessness**

75. The injuries to Plaintiff were caused by Wells Fargo's recklessness in that Wells Fargo's conduct described in paragraphs 5-47 and 60-65 above was the product of wanton misconduct and reckless indifference to its customers' rights and well-being.

17

76. Plaintiff is entitled to punitive damages against Wells Fargo for its conduct, which evidences a willful, wanton, and reckless disregard of her rights.

### Fourth Claim
### Negligent Infliction of Emotional Distress

77. Wells Fargo knew or should have known that its conduct described above involved an unreasonable risk of causing emotional distress and that such distress, if it were caused, might result in illness or bodily injury.

78. Wells Fargo's negligent and reckless conduct caused Plaintiff emotional distress.

79. The distress Plaintiff suffered was of such a nature that it has resulted and may in the future result in illness or bodily harm.

80. The distress suffered by Plaintiff was foreseeable and reasonable in light of Wells Fargo's conduct.

81. Plaintiff is entitled to compensatory damages as a result of Wells Fargo's negligent conduct that resulted in emotional distress.

### Fifth Claim
### Intentional Infliction of Emotional Distress

82. Wells Fargo's conduct described above was extreme and outrageous. Its errors affected thousands of lives, and it intentionally concealed the errors for years, including from Plaintiff. It did so with the purpose of evading government oversight. This conduct was responsible for Plaintiff losing her home. In light of its agreements with regulators and continuing violations of those agreements, Wells Fargo's conduct amounted to highly reckless, wanton, and willful conduct.

83. As a result of Wells Fargo's conduct, Plaintiff has suffered severe emotional distress, which has contributed to physical and psychological injuries.

18

84. Plaintiff seeks compensatory as well as punitive damages against Wells Fargo for its intentional infliction of emotional distress.

**Sixth Claim**
**Breach of Implied Covenant of Good Faith and Fair Dealing**

85. Mortgage modification programs were specifically created to assist qualified borrowers experiencing financial hardship. Plaintiff entered into negotiations for modifications with Wells Fargo with the expectation of good faith and fair dealing by Wells Fargo. Wells Fargo, however, failed to act in a manner consistent with its borrower's objectively reasonable expectations. Wells Fargo dragged out the process for an extended period of time, and then denied the application for mortgage modification despite Plaintiff actually qualifying for the relief.

86. Wells Fargo compounded the problem by making no effort for almost three years to notify Plaintiff that her mortgage modification may have been improperly denied, leaving Plaintiff to suffer with the continuing effects of foreclosure.

87. Wells Fargo's conduct breached the implied covenant of good faith and fair dealing inherent in all commercial relationships in the State of Connecticut, entitling Plaintiff to damages for her injuries.

88. As a result of Wells Fargo's conduct, Plaintiff suffered the injuries described in paragraph 54 above

**Prayer for Relief**

WHEREFORE, Plaintiff requests the following relief:

      A.      Compensatory Damages;

      B.      Statutory damages;

      C.      Punitive damages;

      D.      Attorneys' fees and costs;

      E.      Such other and further relief as allowed by applicable law or the Court may deem

proper.

                                  PLAINTIFF

                                  By_/s/ David N. Rosen_____
                                  David N. Rosen ct00196
                                  Barbara Goren ct26728
                                  David Rosen & Associates, P.C.
                                  400 Orange Street
                                  New Haven, CT 06511
                                  (203) 787-3513
                                  (203) 787-1605 fax
                                  drosen@davidrosenlaw.com
                                  bgoren@davidrosenlaw.com

**CLAIM FOR JURY TRIAL**

Plaintiff claims trial by jury.